**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AURIO GRAYSON, | ) | |
| | ) | Case No. 18 CV 06124 |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | |
| CELLCO PARTNERSHIP, d/b/a Verizon | ) | |
| Wireless, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In 2017, defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") fired

the plaintiff, Aurio Grayson ("Grayson"), from his job as a district manager responsible for

several Verizon Wireless retail stores in the Chicago area. Grayson, an African American man,

sued under the Illinois Human Rights Act ("IHRA"),[1] 775 Ill. Comp. Stat. § 5/1-101 *et seq.*,

alleging that Verizon Wireless's stated reasons for terminating him were a pretext for race

discrimination. Verizon Wireless moves for summary judgment. Because Grayson has raised

genuine fact issues for trial, the court denies the motion.

## I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In

resolving summary judgment motions, "facts must be viewed in the light most favorable to," and

---

[1] Grayson initially filed his complaint in state court. ECF No. 1-1 Ex. A. Verizon Wireless removed the case to this court based on allegations that the parties are citizens of different states, i.e., diversity jurisdiction. *See* Notice of Removal 3, ECF No. 1; 28 U.S.C. §§ 1332(a), 1441(a).

all reasonable inferences from the evidence must be drawn in favor of, the nonmoving party–but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).  In keeping with these principles, the court views the facts in the light most favorable to Grayson.

## II. Factual Background

### A. Work History and Performance

Before describing the investigation that led to Grayson's termination, the parties discuss, and at times dispute, the quality of Grayson's performance.  Grayson had no discipline noted in his personnel file prior to the incident at issue here.  Resp. to Plaintiff's Statement of Additional Facts ¶ 16, ECF No. 48.

Grayson began working for Verizon Wireless as an account manager in 2005.  Resp. to Rule 56 Statement of Undisputed Material Facts ¶ 4, ECF No. 36.  Verizon Wireless promoted him in 2010 and again in 2012.  *Id*. ¶¶ 4–6.

Sometime in late 2014 or early 2015, Grayson's supervisor, "Jim" Marzullo, reorganized district assignments and put Grayson in charge of the downtown Chicago district.  *See* Resp. to SOF ¶¶ 5, 10–11, 15, 20–21.  The reason for the transfer is disputed.  Grayson testified that Marzullo needed him to "fix" performance problems in the downtown Chicago Verizon Wireless stores, implying Marzullo's confidence in his abilities.  Resp. to SAF ¶ 4, ECF No. 48 (quoting Grayson Dep. 93:3-14, ECF No. 33-1, Ex. 1).

As of January 21, 2017, a Verizon Wireless "leader board" showed Grayson as second of eight managers.  Resp. to SAF ¶ 6.  The board ranked the performance of managers on "several key metrics."  *Id*.

**B. Verizon Wireless's Code of Conduct and Expectations**

Verizon Wireless's Code of Conduct requires "all employees to cooperate in any investigation related to Verizon, including being "honest and forthcoming" and providing "truthful information."  Resp. to SOF ¶ 27 (citing Code of Conduct at VZW-Grayson_001118, VZW-Grayson_001144, ECF No. 33-33, Ex. 33) (other citations omitted) (other aspects of paragraph disputed).  Failure to do so could result in termination.  *Id.*  Grayson understood that he was required to work at least eight hours a day, five days a week, and that Marzullo required him to visit each of his stores at least once each week.  *Id.* ¶¶ 23, 46.  "Marzullo requested his district managers to make him aware if they were not going to be in the field visiting their stores during working hours."  *Id.* ¶ 24.  "Marzullo never communicated to his district managers that it was acceptable to work from home in the retail channel under his leadership."  *Id.* ¶ 41.

**C. Work Habits**

Grayson's testimony about his work habits, like all his admissible testimony, must be taken as true and viewed in the light most favorable to him.  He testified that, although his "general routine" varied, he often arrived at his first store at 6:30 a.m., left after 4 p.m., and took work-related calls until after the stores closed (the parties do not say when that occurred).  *See* Grayson Deposition. 173:8–14, ECF No. 33-1.  Grayson sometimes worked weekends at Marzullo's request.  *Id.* 173:19–22.  And Grayson's "availability to [his] staff would never change[].  It was always 24/7, whatever they needed."  *Id.* at 174:7–9.  He admits that there were days he started working "a little later [than 10 a.m.] but left before 4" p.m.  Grayson Dep. 174:18–175:8.  On those days, Grayson said he would either go to Verizon's office in Schaumburg, Illinois, or he "would go home and work remotely."  *Id.* at 175:21–23.

**D. Investigation and Termination**

The parties dispute what, exactly, precipitated the February 2017 investigation that led to Grayson's termination. It is undisputed that Grayson went on a "ride along," which "is an opportunity to shadow another district manager's district," with a fellow district manager, Michael Jordan ("Jordan"), on February 23, 2017.[2] Resp. to SOF ¶ 52. Another Verizon Wireless employee, Tory Stahler ("Stahler"), was also in the car. Grayson Dep. 274:9–16; Jordan Decl. at 1, ECF No. 33-28, Ex. 28. Jordan avers that Grayson was bragging about not working a full day and his plans to work from home the following day. Jordan Decl. ¶ 9. As discussed below, Grayson denies making these statements and others under penalty of perjury. *See* Grayson Aff. ¶¶ 1–19, ECF No. 39-8, Ex. 29. Marzullo testified as follows about how the investigation began:

> I received a credible allegation from another direct report of mine that Aurio Grayson had shared with him -- this was Michael Jordan -- that Aurio had stated and was bragging during a ride-along the day prior that he isn't always in the field, leaves early when he wants, works from home as is. Michael Jordan was a newly promoted district manager and Aurio was bragging about basically coming and going as he pleases. That information was shared with me, and on that Friday, I believe it was the 24th, in the morning time frame there was a series of events that all took place that day. One was the information about Aurio's allegation the day prior. The other thing was I received a text message from one of Mr. Grayson's stores. It was the destination store on Michigan Avenue in Chicago from Filip. He was the general manager who had stated that there was a visitor [a Verizon Wireless VIP] at the store and he was making me aware, which I found to be odd. Generally that information would come directly to me from the district manager. So the series of events of what I felt at the time appeared to be a

---

[2] Grayson objects on hearsay grounds to three paragraphs of Verizon Wireless's Local Rule 56.1(a)(3) statement of undisputed facts. Resp. to SOF ¶¶ 48, 53, 54, ECF No. 36. Each paragraph attributes statements to Grayson about his schedule, citing the declarations and depositions of Verizon Wireless employees who, with one exception, say they heard Grayson make the statements. *See id.* ¶ 48, 54. Paragraphs 48 and 54 do not contain hearsay when considered for the truth of Grayson's purported statements, which he denies making, because Grayson is a party, and an opposing party's statements made in an individual or representative capacity are not hearsay. Fed. R. Evid. 801(d)(2)(A). The court need not reach these objections, however, because it resolves the disputed facts in paragraphs 48, 53, and 54 in Grayson's favor.

credible allegation against Mr. Grayson, and also the information that he wasn't at his location prompted me to reach out to him to understand essentially where he was, and that's when I quickly uncovered that he was not in the field where he was expected and where I believed he was to be.

Marzullo Dep. 38:18–40:3, ECF No. 33-3, Ex. 3; *see also* Resp. to SAF ¶ 18 ("Undisputed that Marzullo received information about plaintiff's statements to Jordan from Stephanie Riker, and then Marzullo spoke with Jordan directly"). In a sworn affidavit, Grayson denies "the accuracy" of these and similar statements attributed to him. He avers that he "never said" those things "or anything remotely similar." Grayson Aff. ¶¶ 2–19, Pl.'s ECF No. 39-8, Ex. 29.

On the evening of February 23, 2017, Grayson sent Marzullo two work-related text messages during the 7:00 p.m. hour. Resp. to SAF ¶ 18, ECF No. 48. The next day, Grayson communicated "honestly" (Marzullo's words) about taking his car to be serviced rather than going to work. *Id.* ¶ 19.

Also on February 24, 2017, Marzullo asked Grayson to provide a list of his store visits for the last two weeks. Resp. to SOF ¶ 58, ECF No. 36. Grayson listed two stores for that date, but it is undisputed that he did not visit any stores that day. *See id.* ¶¶ 58–59. Grayson testified that the list was erroneous because he prepared it on his phone in the middle of the day, but the email was accidentally stuck in draft until it was sent in the 6:00 p.m. hour. *See id.*

Marzullo contacted Ayanna Johnson ("Johnson"), a Human Resources employee, and requested records of Grayson's "badge swipes" for January–February 2017. Resp. to SOF ¶ 60. District managers have electronic key cards they use to access secure parts of some Verizon Wireless stores. Resp. to SOF ¶ 49. A badge was not needed to access some areas of the stores in Grayson's territory, such as the "inventory door" or manager's office. *See id.* Grayson's badge access records showed no badge activity in any of his stores on a dozen workdays in January and February 2017, and no swipes after 2:00 p.m. in any of his stores. Resp. to SOF

¶¶ 61, 62 (not materially disputed).  As discussed below, Grayson testified that he later told

Marzullo that he lost his badge in February 2017.  *See id.* ¶ 51.

Johnson and Marzullo met with Grayson on March 2, 2017.  Resp. to SOF ¶ 64.  The

parties sharply dispute what happened at the meeting.  According to Marzullo and Johnson's

version, Grayson initially took the position that he was meeting expectations, but he "changed

his story during the latter part of the meeting."  Def.'s SOF ¶ 65.  Grayson purportedly admitted

that he "went home after Monday morning staff meetings in Schaumburg, after kickoff rallies,

and after helping a friend or relative in a store far from his district during the 1:00 p.m. hour."

*Id.* (citations omitted).

Grayson testified as follows about what happened at the meeting:

> Well, when I walked in I saw Ayanna sitting there and Jim.  So I first assumed it
> was about my year end review . . . but I was blindsided regarding my badge
> swipes that they showed me and first they were asking me about my visitation
> and I told them that I visit my stores once a week and they kept asking me the
> same questions over and over again. I just gave in because they kept trying to
> change the wording and then finally I gave in and said, hey I don't visit my
> stores all the time.  They were like, ha, like it was a big deal.  So I was like okay,
> I give in so what's next? . . . at some point I felt that, Okay, if I just give in
> they'll just put me on a verbal or whatever they wanted to do because I didn't
> feel like they were on my side, I didn't feel like it was fair, this was handled
> justly so then I panicked. I was like, oh, my God, you know, they're not going to
> let this go so I just said I'll go along with it, okay.

Grayson Dep. 288:1–290:7, ECF No. 39-1, Ex. A.  Grayson's version must of course be accepted

as true at summary judgment.

Marzullo and Johnson talked after the March 2, 2017, meeting with Grayson.  Resp. to

SOF ¶ 67; Resp. to SAF ¶ 25.  They discussed no option other than terminating Grayson.  Resp.

to SAF ¶ 26.

"The way Verizon's termination process typically works is that approval for the

termination of a District Manager is required from the head of the retail channel (Brian Pascoe)

and head of Human Resources which is Craig Ritchie."  Resp. to SAF ¶ 9; *see also id*. ¶ 7

(undisputed that Ritchie's approval was needed to terminate Grayson).  Marzullo reported to

("Pascoe").  Resp. to SAF ¶ 8.

Marzullo recommended terminating Grayson.  Resp. to SOF ¶ 67-68.  Marzullo felt that

because plaintiff had essentially been "stealing [Company] time" and did not initially admit to

his misconduct, he could not be trusted to remain in the district manager role.  *Id*. ¶ 68

(undisputed; citation omitted).  Ritchie agreed and approved the termination request on the day

of the meeting with Grayson, March 2, 2017.  *Id*. ¶ 69 (citing Johnson Dep. 198:2-13, ECF

No. 39-5, Ex. 5); Resp. to SAF ¶ 25.  Pascoe approved the termination.  Resp. to SAF ¶ 26.  On

March 4, 2017, Grayson was terminated for "not fulfilling the expectations of his job and not

being forthcoming during an investigation interview."  Resp. to SAF ¶ 27.

It is undisputed that neither Pascoe nor Ritchie had previously used badge data to justify

terminating an employee.  Resp. to SAF ¶ 24.  Ritchie testified that reports of badge activity

sometimes "don't tell the full story."  *Id*. (quoting Ritchie Dep. 168:21-22, ECF No. 39-3, Ex. 3).

Despite the fact that she was on the ride along with Grayson and Jordan, no one

interviewed Stahler, and neither Johnson nor Ritchie spoke with Jordan.  Resp. to SAF ¶¶ 17, 23.

Also, prior to the March 2, 2017, meeting, Johnson prepared a list of district managers reporting

to Grayson to be interviewed.  Resp. to SAF ¶ 21 (partially disputed).  Marzullo and Ritchie

agreed that the interviews were not necessary after the meeting.  *Id*. ¶ 22.

## III. Analysis

Due to the similar purposes and language of the IHRA and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., "Illinois courts apply the federal Title VII framework to IHRA [employment discrimination] claims." *Volling v. Kurtz Paramedic Servs., Inc.,* 840 F.3d 378, 380 (7th Cir. 2016) (citing *Rabé v. United Air Lines, Inc.*, 971 F.Supp.2d 807, 821 (N.D. Ill. 2013)); *see also Gusciara v. Lustig*, 806 N.E.2d 746, 750 (Ill. Ct. App. 2d Dist. 2004) ("In construing and applying the [IHRA] . . . Illinois courts have long followed federal cases interpreting Title VII . . . ." (citations omitted); *but see id*. at 752 (declining to adopt one aspect of Title VII jurisprudence not at issue here). In *Ortiz v. Werner Enterprises, Inc*, 834 F.3d 760, 764–65 (7th Cir. 2016), an IHRA case in which the plaintiff claimed he was fired because of his Mexican ethnicity, the Seventh Circuit abolished any distinction between "direct" and "indirect" methods of proving employment discrimination. At summary judgment, the question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id*. at 764.

Some of the cases the parties cite apply the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973):

> Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (internal quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 765. "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at

which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.*

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (alteration in original).

Verizon Wireless argues that Grayson cannot make out a *prima facie* case under *McDonnell Douglas* because he cannot show that he was meeting his employer's legitimate expectations. But Grayson makes clear in his response that he is claiming that Verizon Wireless singled him out for discriminatory discipline. *See* Resp. Mot. Summ. J. 10–11, 19–20, ECF No. 36. As detailed below, he has come forward with adequate supporting evidence.

Accordingly, Grayson does not need to establish that he was meeting Verizon Wireless's legitimate expectations as part of his *prima facie* case. "The precise requirements of a prima facie case [of employment discrimination] can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)) (other citations omitted). The Seventh Circuit has held that "where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations.'" *Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001) (quoting *Flores v. Preferred Technical Grp.*, 182 F.3d 512, 515 (7th Cir. 1999)) (alteration in original). Stated more generally, "'[w]hen a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably.'" *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002)).

Grayson relies on the same evidence to create a fact issue at *McDonnell Douglas's* first and third (*prima facie* case and pretext) steps. Mem. Opp'n. to Summ J. 8–9, ECF No 38. He compares the handling of the February 2017 interview to the investigation and discipline of five white current or former Verizon Wireless district managers. *Id.* Verizon Wireless responds that none is similarly situated enough to Grayson to create a genuine fact issue for trial.

Since the analyses at *McDonnell Douglas's* first and third step effectively merge here, the court finds it simpler to consider the summary judgment evidence holistically and ask whether a reasonable jury could find that Grayson's race caused his firing. *See Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (citing *Ortiz*, 834 F.3d at 765); *Coleman*, 667 F.3d at 853 ("As the Supreme Court, this court, and other circuits have held, a discrimination plaintiff may employ . . .comparator evidence to discharge her burden at the pretext stage as well as to satisfy the fourth element of her prima facie case."); *Peirick v. Ind. Univ.*, 510 F.3d 681, 687–88 (7th Cir. 2007) ("The defendant's expectations are not legitimate if they are phony; so if they are argued to be phony, the issue of legitimate expectations and the issue of pretext seem to merge." (quoting *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir.1997)).

## A. Grayson's Comparators

Grayson compares his investigation and the discipline ultimately meted out to the investigations of five white district managers. *Verizon Wireless* did not fire any of the comparators. *See* Resp. to SAF ¶¶ 29, 34, 37, 38, 39.

### 1. Aaron Ziomek

In 2015, Johnson, who was one of Grayson's two interviewers, investigated allegations that Ziomek, among other things, did not visit his stores frequently enough. Resp to SAF ¶ 35. The investigation took 50 days. *Id.* Badge swipe data was not analyzed, and nine of Ziomek's

subordinates were interviewed.  *Id.* ¶ 35.  Ziomek ultimately received a written warning for making an inappropriate comment during the investigation.  The underlying allegations were not substantiated.  Ritchie Dep. 87:6–8.

### 2. Jason Gaca

In 2014, Johnson and her supervisor, Beth Harris ("Harris"), investigated Gaca.  Resp. to SAF ¶ 30.  Gaca reported to Marzullo at the time.  *Id.* ¶ 29.  "There were three issues involved with Jason Gaca's conduct: his truthfulness, his sales practices, and the fact that he did not have a collegial relationship with his team such that they would communicate with him."  *Id.* ¶ 30 (undisputed fact).  The investigation also involved a possible Code of Conduct Violation.  *Id.* ¶ 31.  There was concern that a member of Gaca's sales team may have been contacting customers during a 14-day "price protection policy."  If true, the practice ran the risk of violating federal "do not call" policies.  *Id.*

Johnson, Harris, and Verizon Wireless corporate security personnel interviewed Gaca twice during the investigation, and Johnson also interviewed seven of the nine managers who reported to Gaca.  *Id.* ¶¶ 30, 32.  Johnson recommended that Gaca be terminated.  Resp. to SAF ¶ 32 (partially disputed); Johnson Dep. 39:7-11, ECF No. 39-5, Ex. 5.  Resolving a fact dispute in Grayson's favor, Marzullo, Ritchie, and Harris participated in the decision to issue Gaca a final written warning instead of firing him based in part on his lack of a prior disciplinary history.  *Id.* ¶ 33.

Marzullo testified that he initially had reservations about reducing Gaca's discipline, but as he delved into the matter, he ultimately agreed.  *See id.* (citing Marzullo Dep. 88:10–89:12).  Verizon Wireless points to Ritchie and Marzullo's deposition testimony.  Ritchie described the Gaca investigation as involving a question of whether Gaca's explanation of an email to his

subordinates was "credible." Ritchie Dep. 66:12-21. Marzullo testified that based on what he was told about the interviews with Gaca, Gaca was forthcoming, and Marzullo "did not feel like that there was enough . . . concrete information that we would say Jason [Gaca] is lying, Jason's story is ridiculous and, therefore, we should end his employment. But we did believe that he had accountability for the fact that his leadership team essentially ended up communicating something to their teams that was not appropriate and not in keeping with our sales practices." Resp. to SAF ¶ 33 (citing Ritchie Dep. 65:15-67:18).

### 3. Chris McCormick

Following an investigation, Marzullo issued a final written warning to McCormick in 2013. *Id.* Marzullo was in charge of Verizon Wireless's Great Plains region in Nebraska at the time. *Id.* The warning stated that McCormick had been inviting select Verizon Wireless subordinates to "poker parties" at his home and encouraging them not to mention the parties to coworkers. *Id.* (quoting Marzullo Dep. 107:9-11, ECF No. 39-2).

Marzullo's reasons for not recommending firing McCormick are genuinely disputed. *See id.* With inferences favorable to Grayson, Marzullo testified at his deposition that McCormick was a "legacy employee" from another company that condoned socializing outside the workplace. *See id.* Marzullo, and someone from Human Resources, spoke with McCormick, and he was, in Marzullo's words, "upfront" and "honest" about having the parties. Marzullo Dep. 115:7. McCormick thought the parties were unproblematic since, AllTel (McCormick's prior employer), never had a problem with them. *See* Marzullo Dep. 114:14–19. Again, a jury could find that Marzullo and the Human Resources manager believed McCormick's story and that their credibility decision weighed heavily in the discipline they selected. *See id.* Marzullo

testified that he also thought firing was inappropriate because McCormick "told [Marzullo] exactly what we asked him the questions to" during the investigation. *See id.* at 115:15–18.

### 4. Scott Hodges

In 2016, Hodges received a final written warning from Ritchie for sending a GroupMe (a workplace communication app) message "of a sexual nature" (no details are provided) to his subordinates. Resp. to SAF ¶ 38. It is undisputed that Hodges took steps to remediate his error prior to Verizon Wireless's investigation. *Id.* Pascoe recalled that Hodges stated he accidentally sent the message; he meant to send something else to his team. Pascoe Dep. 73:24–74:4, ECF No. 33-4, Ex. 4.

Ritchie considered Hodges's lack of disciplinary history when deciding whether to fire him. Resp. to SAF ¶ 38 (undisputed fact). Ritchie also testified that Hodges was not fired because he "took steps to correct this error" and because he was cooperative during the investigation. *Id.* (citing Ritchie Dep 111:9–10). Ritchie testified that "[w]e believed [Hodges's] explanation," though a reasonable jury could find the explanation to be suspicious. Ritchie Dep 109:13–18.

### 5. Ryan Way

Ritchie issued a final written warning to Ryan Way for working for a cell phone repair business during his off hours. Resp. to SAF ¶ 39. Verizon Wireless considered the repair business to be directly competitive, making Way's moonlighting a Code of Conduct violation. *See* Ritchie Dep. at 118:12–119:11, ECF No. 39-3. Ritchie testified that Verizon Wireless did not repair phones, so he and others involved in the decision not to fire Way believed his explanation that he did not think what he was doing was directly competitive. *See id.* Ritchie

also considered the fact that Way had not been previously found to have violated Verizon Wireless's Code of Conduct.  Resp. to SAF ¶ 39.

**B. Are the Comparators Similarly Situated to Grayson?**

"Whether a comparator is similarly situated is 'usually a question for the fact-finder,' and summary judgment is appropriate only when 'no reasonable fact-finder could find that plaintiffs have met their burden on the issue.'"  *Coleman v. Donahoe*, 667 F.3d 835 847–48 (7th Cir.2012) (quoting *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir.2009).  A comparator must be similar enough to the plaintiff "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable: complaints about discrimination."  *Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir.2018) (quoting *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008)) (alterations omitted).  Although "the number of relevant factors depends on the context of the case  . . . [,] [i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"  *Coleman*, 667 F.3d at 848 (first quotation omitted; second quoting from *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir.2008)).

*1. Common Decisionmaker*

Verizon Wireless argues that one comparator, Ziomek, should be eliminated because he did not share a common supervisor with Grayson.  *See* Reply 6–9, ECF No. 47.  The common supervisor factor eliminates possible differences in how supervisors exercise discretion.  *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000).  Thus, if a higher-level supervisor was responsible for the disciplinary decisions for both employees, eliminating a

comparator because the comparator had a different first-line supervisor "misses the point of the common supervisor factor . . . ." Under Title VII, a "decisionmaker is the person 'responsible for the contested decision.'" *Coleman*, 667 F.3d at 848 (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir.2003)).

All five comparators share Ritchie as a common decisionmaker whose approval was required for their discipline. The parties agree that Ritchie had to approve Marzullo's recommendation to terminate Grayson. Resp. to SAF ¶ 7, ECF No. 48. And there is evidence that Ritchie considered whether additional interviews were needed. *See* Resp. to SAF ¶ 20 (disputed fact; citing Ritchie Dep. 38–39) (other citations omitted).

From his testimony, the jury could find that Ritchie was responsible for the ultimate decisions for all five comparators. *See also* Resp. to SAF ¶ 9 (termination decision "typically" required the approval of Ritchie and Pascoe). A jury could therefore find that all of the comparators shared a common supervisor responsible for the disciplinary decision. *See Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (finding comparators similarly situated who shared a common supervisor up "different branches of the chain of command"); *Coleman*, 667 F.3d at 848 (holding that higher-level decisionmaker was a common supervisor for similarly situated employees).

### 2. Subject to the Same Standards of Conduct

The presence of a different first-line supervisor setting attendance standards for Ziomek precludes him from being a comparator on this record. Verizon Wireless describes this as a common supervisor problem. The problem is really that Grayson points to no evidence showing that he and Ziomeck were subject to the same standards.

Ziomek worked in a different Verizon Wireless territory than Grayson (Great Lakes North), and he reported directly to Jarrett Dawson ("Dawson"). Resp. to SOF ¶ 73. Grayson points to no evidence establishing what attendance standards Dawson set for his district managers or what, if any, discipline Dawson recommended to Ritchie. *See id*. To create a fact issue, Grayson cites Johnson's testimony describing the Ziomek investigation. *See id*. Grayson identifies no evidence eliminating the possibility that Dawson's different standards for his employees and his discretion in recommending discipline account for the outcome of the Ziomek investigation. *See Donley v. Stryker Sales Corporation*, 906 F.3d 635, 643–44 (7th Cir. 2018); *Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) (explaining that different decisionmakers "may rely on different factors when deciding whether, and how severely, to discipline an employee").

But, contrary to Verizon Wireless's arguments, a jury could find that each of the other four comparators was subject to the same standards of conduct. *See Coleman*, 667 F.3d at 849 (finding comparators similarly situated because they were accused of violating different, but comparably serious, portions (violence and harassment) of the employer's policy that applied to all workers). Each comparator faced discipline for a Code of Conduct offense Verizon Wireless considered serious enough to make termination a possible outcome. Indeed, Johnson initially contemplated terminating Gaca, and Marzullo and Ritchie testified about their reasons for issuing final written warnings instead of terminating the other comparators. *See* Resp. to SAF ¶¶ 29–39. Thus, even though the comparators faced allegations of different violations, the jury could nevertheless find that Verizon Wireless considered them to be comparably serious.

*3. Similar Conduct*

Verizon Wireless offers several variations on a theme in its efforts to distinguish the comparators from Grayson. In none of the comparators' investigations, contends Verizon Wireless, did the employee being investigated first deny wrongdoing and then admit it. Grayson's purported admissions explain, according to Verizon Wireless, its failure to interview Grayson a second time, the decision not to interview Grayson's subordinates, and the failure to take any other investigative steps after the March 2, 2017, meeting. Because Marzullo, Ritchie, or both considered the comparators to have been honest and cooperative in their investigations, none can be proper comparators, according to Verizon Wireless. *See* Reply 6–9. As Marzullo put it in his testimony, Grayson "caved" at the March 2, 2017, meeting, so, unlike the comparators, little to no further investigation was needed. Marzullo Dep. 166:13; *see* Reply 10; *see also* Reply 2, 3–4, 7–9, ECF No. 47.

But Verizon Wireless asks the court to resolve genuinely disputed facts in Verizon Wireless's favor. Verizon Wireless wants the court to credit Marzullo's testimony about what occurred at the March 2, 2017, meeting. *See* Resp. to SOF ¶¶ 65–67 (citing competing testimony). At his deposition, Grayson admitted that he eventually told Marzullo and Johnson that he sometimes left early and was not physically present in each of his stores at least once a week. Grayson Dep. 289:1-6. Grayson's testimony about why he made this admission must also be accepted as true at summary judgment. *See, e.g.*, *Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 393 (7th Cir. 2012). Grayson testified that Johnson and Marzullo pressured him until he confessed; they repeatedly asked Grayson the same questions and seemed to be driving at some other point; and they would not "listen to reason" and ignored what he told them about losing his badge. *See id.* at 289:18.

Many inferences could be drawn about why Marzullo and Johnson badgered Grayson. One favorable to Grayson is that Marzullo and Johnson wanted to pressure Grayson to confess. Why would they pressure Grayson? Marzullo and Johnson, a jury could find, wanted to avoid an investigation because they feared that it would confirm what Grayson was telling them. Grayson testified that he often started his workdays at 6:30 a.m., that he took calls from subordinates throughout the evening, and that he had adequate explanations for the discrepancies in his badge swipe records. *See* Resp. to SAF ¶¶ 11–13. It would be reasonable to infer that interviewing Grayson's subordinates would have corroborated his explanations and further that Marzullo and Johnson wanted to avoid favorable evidence coming to light. *See id.*

Once the facts as they must be seen at summary judgment have been clarified, it becomes clear that the comparators are similarly situated enough to permit a jury to decide whether the handling of their investigations proves discriminatory intent. The Seventh Circuit has repeatedly emphasized that "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, yet this is a flexible inquiry with no magic formula." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018) (quoting *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018)). Disparities between how two employees are investigated and disciplined for comparably serious offenses can support a finding that the employer harbored discriminatory intent. *See Orton-Bell v. Indiana*, 759 F.3d 768, 778 (7th Cir. 2014) ("disparity of consequences" permitted inference of discrimination); *Smiley v. Columbia Coll. Chicago*, 714 F.3d 998, 1003 (7th Cir. 2013) ("An employer's investigation, or lack thereof, can inform the pretext inquiry.") (citing *Humphries*, 474 F.3d at 407)). A shoddy investigation does not prove that the reasons for an employment decision are a lie; "Erroneous (but believed) reasons for terminating an employee are not tantamount to pretextual reasons." *Humphries*, 474 F.3d at 407

(citing *Forrester*, 453 F.3d at 419 (other citations omitted)). In *Smiley*, the Seventh Circuit

described a case in which disparities in how employees were investigated raised a genuine issue

for trial:

> In *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (7th Cir.2010) the
> director of nursing decided to fire the plaintiff within twenty-four hours of
> receiving a complaint that the plaintiff had used profanity, a decision we said the
> director "reached in an unusual way." *Id*. at 916. Although normally the unit
> supervisor would have investigated charges in her unit, the director conducted his
> own investigation and decided to fire the plaintiff. He made that decision without
> considering the unit supervisor's conclusion that the complaint was unfounded
> and also without interviewing the plaintiff. The plaintiff also showed that another
> employee was not questioned about failing to respond to a bed alarm (which the
> employer later gave as another reason to fire the plaintiff) until two weeks after
> the incident, and then was not disciplined. *Id*. Under those circumstances, we
> concluded that a jury should decide whether the plaintiff's discharge was racially
> motivated. *Id*.

*Smiley*, 714 F.3d at 1013.

Similarly here, a reasonable jury could find that Marzullo and Ritchie approached

Grayson's investigation and the decision to terminate him in a markedly different way than they

approached allegations of comparable seriousness against white district managers. For instance,

the jury could find that Marzullo and Ritchie wrestled with Johnson's recommendation to

terminate Gaca, ultimately reducing the recommended firing to a final written warning. *See*

Resp. to SAF ¶ 33. But there is evidence that Johnson and Marzullo discussed no discipline for

Grayson other than termination. *Id*. ¶ 27.

Also, a reasonable jury could find that Marzullo and Ritchie investigated the comparators

in a much more open-minded way than they did Grayson. In contrast with Marzullo and

Johnson's aggressive questioning of Grayson, Marzullo and Ritchie decided on a final written

warning for Gaca because they found his innocent explanation (not given in their presence) for

sending an email credible. *See* Resp. to SAF ¶ 33 (quoting Marzullo Dep. 176:5-179:6). They

also considered his lack of a disciplinary history. *See id.* There is no evidence that they probed Gaca's innocent explanations for his conduct, and there is considerable evidence that investigators followed up to verify his claims. *See id.*

Similarly, one could reasonably doubt McCormick's statements that he thought holding poker parties at his home, inviting some of his employees, and telling them not to mention the parties to their co-workers was appropriate managerial behavior. McCormick received the benefit of the doubt from Marzullo. Again, Marzullo judged McCormick's explanation to be reasonable, characterizing his behavior as "honest" and "upfront." Marzulo Dep. 115:7. There is no evidence that Marzullo subjected McCormick to repeated questions. *See* Resp. to SAF ¶ 37.

A jury disposed to find for Grayson could see the Hodges and Way investigations as fitting the pattern. A white district manager again gets the benefit of the doubt and the benefit of consideration of his disciplinary history in mitigation. Seen favorably to plaintiff, Ritchie took Hodges's explanation that sending a sexually explicit message was an accident at face value and considered his lack of a documented disciplinary history. *See* Ritchie Dep 110:15-22; Resp to SAF ¶ 38. Ritchie chose to believe Way's possibly dubious statement that he did not think a cell phone repair business was directly competitive with Verizon Wireless, and Ritchie again considered Way's lack of disciplinary history when selecting appropriate discipline. *See* Resp. to SAF ¶ 39.

From this evidence, the jury could see a pattern. Investigations typically involved interviewing many of the district manager's subordinates and assessing the impact of the alleged misconduct on the team. Not so with Grayson. Though Johnson prepared a list of possible

subordinates to interview before meeting with Grayson, Ritchie and Marzullo did not use it. *See id.* ¶ 20.

Marzullo and Ritchie also broke their pattern of taking district managers' sometimes questionable explanations for their behavior at face value. *See Humphries*, 474 F.3d at 407 (affirming denial of summary judgment in part because employer took co-worker's story at "face value" and did not investigate). Instead of taking Grayson's initial denials and explanations at face value and interviewing Stahler (who was also on the ride along) and Grayson's subordinates, Ritchie and Marzullo pressed Grayson to "cave." *See* Marzullo Dep. 164:18-165:21; Grayson Dep. 288-290.

Additional evidence buttresses the inferences the jury could draw from the comparators' investigations. To cite a pair of examples, Grayson's denials that he bragged about leaving work early must be taken as true. *See* Grayson Aff. ¶¶ 1–19. The jury could find that someone fabricated Grayson's statements. Furthermore, before Grayson, neither Ritchie nor Pascoe had used badge swipe data to fire an employee. *Id.* ¶ 35. A jury could also rely on the undisputed facts that Grayson exchanged work-related text messages in the evening of February 23, 2017, and communicated in what Marzullo admitted was an honest fashion about taking his car to be serviced the next day. This could be seen by the jury as undercutting Marzullo's explanation for firing Grayson. Resp. to SAF ¶¶ 18–19.

Considering all of this evidence together and in the light most favorable to Grayson, a reasonable jury could disbelieve Verizon Wireless's explanation for terminating him and infer that race-based discrimination caused Grayson's firing. *See Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (7th Cir. 2010); *Humphries*, 474 F.3d at 407.

## IV. Conclusion

For the reasons stated, Verizon Wireless's motion for summary judgment is denied.

Dated:  March 12, 2020                          _____/s/_____

                                                Joan B. Gottschall
                                                United States District Judge